## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| *v.* | ) | **Case No. 1:23-cr-00252 (ACR)** |
| | ) | |
| **MARIO MARES** | ) | |
| | ) | |
| Defendant. | ) | |

## <u>DEFENDANT'S RULE 29 MOTION FOR A JUDGMENT OF ACQUITTAL PRIOR TO VERDICT</u>

Defendant Mario Mares, pursuant to the Federal Rules of Criminal Procedure Rule 29 submits this Motion for a Judgment of Acquittal because the prosecution failed to present sufficient proof from which any rational trier of fact could conclude beyond a reasonable doubt that Mr. Mares is guilty for every element of the crime for each and every count, and where defense witnesses showed that no reasonable juror could find guilt beyond a reasonable doubt. Mr. Mares requests a judgement of acquittal for Counts 1, 2, 3, 4 in the Indictment and provides the following in support:

## I.     <u>LEGAL STANDARD</u>.

A court can grant such a motion only if the evidence, considered "in the light most favorable to the government," is not "sufficient to permit a rational trier of fact to find all of the essential elements of the crime beyond a reasonable doubt." *United States v. Kayode*, 254 F.3d 204, 212 (D.C. Cir. 2001). See *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

### A.     <u>Fed. R. Crim P. Rule 29 States That a Court May Grant a Judgment of Acquittal When the Prosecution Fails to Prove All Elements of a Crime Charged</u>.

**1. The prosecution must state all elements of the crime with specificity and then prove beyond a reasonable doubt each element of every crime charged.**

Evidence is insufficient to sustain a conviction when it goes no further than to "raise a question [of guilt] in a reasonable man's mind" or "create suspicion." *Cooper v. United States*, 218 F.2d 39, 42 (D.C. Cir. 1954). Even when evidence raises a "grave suspicion" in the reasonable juror's mind as to guilt, it is insufficient to support a verdict, unless proof of guilt beyond "a reasonable doubt" is possible on the evidence. *Scott v. United States*, 232 F.2d 362, 364 (D.C. Cir. 1956). In other words, "*some evidence of guilt*" is not enough. *United States v. Valle*, 807 F.3d 508, 515 (2d Cir. 2015) (emphasis added).

**2. In considering a Rule 29 motion this Court must grant it if speculation is relied upon by the government.**

"The court may not permit a jury to render a guilty verdict based on 'ambiguous evidence' from the government, which encourages the jury to 'engage in speculation.'" *Bailey v. United States*, 416 F.2d 1110, 1116 (D.C. Cir. 1969).

**3. Restated, the Court must grant a motion for judgment of acquittal if a "reasonable juror must necessarily have had a reasonable doubt as to the defendant[']s guilt."**

See *United States v. Weisz*, 718 F.2d at 437 (citing *United States v. Singleton*, 702 F.2d 1159, 1162-63 (D.C. Cir. 1983)). See also *United States v. Reese*, 561 F.2d 894, 898 (D.C. Cir. 1977); *Curley v. United States*, 160 F.2d 229, 232-33 (D.C. Cir. 1947) ("[I]f there is no evidence upon which a reasonable mind might fairly conclude guilt beyond reasonable doubt, the motion [for judgment of acquittal] must be granted."), cert denied, 331 U.S. 837 (1947). *United States v. Jabr*, 2019 U.S. Dist. LEXIS 238718, *9-10, 2019 WL 13110682 (D.D.C., May 16, 2019).

**4. This Court must give the government the benefit of only "legitimate inferences."**
*Singleton*, 702 F.2d at 1163. A court should not speculate or bend statutes where the government invents guilt from innocence.

> Moreover, Rule 29 does not require the Court to view the evidence through dirty windowpanes and assume that evidence which otherwise can be explained

as equally innocent must be evidence of guilt. See *Curley*, 160 F.2d at 233
(if "a reasonable mind must be in balance as between guilt and innocence, a
verdict of guilt cannot be sustained").

*United States v. Recognition Equip., Inc.*, 725 F. Supp. 587, 588 (D.D.C. 1989).

 **5. If a reasonable trier of fact would have a reasonable doubt as to the existence of any of the essential elements of the crime, the Court must acquit**.

*United States v. Durant*, 208 U.S. App. D.C. 374, 648 F.2d 747 (D.C. Cir. 1981); see also

United States v. Foster, 251 U.S. App. D.C. 272, 783 F.2d 1087, 1088 (D.C. Cir. 1986).

 **B.** <u>**Intent Must be Proven for Every Crime Except Those for Strict Liability**</u>.

The U.S. Supreme Court made this clear:

> The contention that an injury can amount to a crime only when inflicted by
> intention is no provincial or transient notion. It is as universal and persistent
> in mature systems of law as belief in freedom of the human will and a consequent
> ability and duty of the normal individual to choose between good and evil. A
> relation between some mental element and punishment for a harmful act is almost
> as instinctive as the child's familiar exculpatory 'But I didn't mean to,' and has
> afforded the rational basis for a tardy and unfinished substitution of deterrence
> and reformation in place of retaliation and vengeance as the motivation for public
> prosecution.

*Morissette v. United States*, 342 U.S. 246, 250-51 (1952).


**II.**   <u>**ARGUMENT**</u>.

 The full trial showed insufficient proof from which any rational trier of fact could conclude

beyond a reasonable doubt that Mr. Mares was guilty for any, let alone every element of the

criminal elements for each count.

 **A. The Government Did Not Prove Each and Every Element of Count 1, *18 U.S.C. § 1752(a)(1)* Entering or Remaining in a Restricted Building or Grounds Beyond a Reasonable Doubt**

 *Elements*

To find the defendant guilty of this offense, the factfinder must find that the

government proved each of the following elements beyond a reasonable doubt:

1. Without lawful authority to do so the defendant knowingly entered or remained in a restricted building or grounds.
2. Second, the defendant knew the area was restricted for a USSS protectee[1]
3. Third, the Defendant knew that a USSS protectee, here Vice President Pence, was in the Capitol building or scheduled to visit.[2]

**1. First, the Government did not show the grounds on the west side were anything more than colloquially closed.** The final bench instructions, using 1:23-cr-00170-CJN Document 40, stated:

> It is insufficient for the government to prove that the defendant merely knew that the area he entered or remained in was restricted in the colloquial sense. The government must instead prove that (A) the defendant knew that the area was posted, cordoned off, or otherwise restricted and (B) the defendant knew that the Vice President or the Vice President's immediate family was or would be temporarily visiting the area.

The government provided only hearsay and witness speculation that the outside west area was closed in any relation to a USSS protectee's visit. Witness Mendoza, whose testimony has changed over the course of two years and many trials, newly added that her boss attended some security meetings. Despite discovery requests by defense counsel in this and almost every January 6th case, the government provided zero documentation of any meetings held by the United States Capitol Police (USCP) with or without USSS presence. Not a single meeting minute, record, or shred of evidence is contained in the 7+ terabytes of Relativity data base discovery, which the government refers defense counsel to after providing nothing before trial. The fact is: the outside west of the US Capitol was never restricted for anything other than protection of the inaugural stage build out.

---

[1] The Couy Griffin court held that the defendant did not have to know about a specific USSS protectee, but the restricted area required some designation for USSS protection, where some form of notice was given to the public (signs, cordon as examples). USCA No. 22-3042.

[2] Required by Indictment at ECF No. 1. Given different facts not involving this case's Indictment, Griffin held "1752(a)(1) does not require that the defendant further know which of the subsection (c)(1) requirements is the reason for the restriction." USCA No. 22-3042 at 25.

Witness Mendoza was familiar with the USCP CDU Operation Plan at D103 and MPD at D126/126A. Although having responsibility for CDU elements, she had no authorship of the USCP document. The document showed permitted rallies. D111 showed normal demonstration areas, which include the west lawn. D126A was not disseminated to the public and was marked for internal use.

**2. The USSS did not request or coordinate for any outdoor restricted area**. The evidence showed that west side was closed for the inaugural stage build-out and not for security of a USSS protectee for the period of September 2020 through February 2021. D101. The USSS are not mentioned a single time in D101 or D103. There was no coordination between the USCP and USSS going back to December 28, 2020.  Further, the Mission Objectives listed for the USCP made no mention of protecting Mr. Pence or any USSS protectee, and instead were:

> *1. To provide an environment in which lawful first amendment activity can be safely demonstrated.*
> *2. To prevent any adverse impact to the legislative process associated with unlawful demonstration activity.*
> *3. To effectively mitigate actions associated with civil disorder; safely respond to crimes of violence and destruction/defacing of property.*
> *4. To safeguard and prevent any property damage directed at the US Capitol, West Front Inaugural Platform, and all Congressional buildings.*
> *5. Establish and maintain a fixed march route while excluding access to counter-protestors to minimize potential for violent interactions.*

D103 at 3.

Witness Mendoza could not testify as to what signs were visible after 2 p.m. on January 6, 2021. She only saw what was posted before she left work early on the morning of January 6, 2021. She did not know what barriers were and were not manned on the west side when marchers arrived around 2 p.m. The government's exhibits showed what was "supposed" to be, although the provenance of the "redline" map (G003) that was created for litigation was not supported by testimony or facts. The government only showed a video montage that did not include Mr. Mares

and bore no relation to when he was near and on the outside west grounds. G001 was presented to create unfair prejudice, while using the excuse of "context."

The government expects conviction based on speculation and the acts of others unknown to Mr. Mares for a *colloquially closed area* where all prior signs were not visible to Mr. Mares. Not a single fact showed the coordination for, or creation of an area restricted for a USSS protectee. The government, contrary to *Cooper*, *Scott*, *Bailey*, and *Singleton supra* expects the Court to infer and speculate that the USCP must have created the area for a USSS protectee - despite no evidence besides inadmissible hearsay and government inferences. Not a scintilla of evidence showed the outdoor west side was restricted for protection of a USSS protectee. The claim is a government fabrication created after January 6, 2021.

**3. The USSS are responsible for all restricted areas and the USSS witness admitted that as the USSS "Advance" designee, she did no coordination to establish a restricted area.**

The USSS Advance lead (Witness Glavey here) was responsible based on her claimed duties for coordination, designation of, and security measures for any USSS restricted area. The witness was not even designated as "advance lead" until January 4, 2021. That speaks to there being no prior coordination, despite her speculation that some other USSS unidentified person probably coordinated. The notice of visit was not submitted until January 5, 2021. G101-102. Witness Glavey, the responsible person, did not walk the outside grounds. She did no outdoor threat vulnerability assessment as her job required if anywhere outdoors were to be restricted. She reviewed no plans. She attended no meetings. She had no documentation. In testimony she ignored the recent declarations in Congressional testimony from USSS Director level after the July 13, 2024, and September 15, 2024, Trump assassination attempts by waiving off her responsibility where despite any local police, she as the USSS advance lead was responsible for all zones of security and could not delegate responsibility. She as "advance" lead was responsible and covered

over that she did nothing, while more than disingenuously inferring that a USSS restricted area existed. Despite the exorbitant number of times she has testified, the USSS witness has no credibility about any claims that anywhere outside the building was restricted for protection of a USSS protectee. Her testimony was designed to convict based on inference upon inference. She used phrases to obfuscate, such as "normally would" and "some agreement existed." The only thing credible was that the east side plaza was closed to control access to vehicle parking.

The west outdoor area was not restricted for any USSS protectee. It was closed from September 2020 until February 2021 for stage construction and removal. The USCP increased the perimeter to keep protestors off the grounds for protection of the stage. That is all the evidence showed.

**4. The government did not show that Mr. Mares saw any signs or had any notice of a restricted area.**

When Mr. Mares was at the Monument across the street from the west side at approximately 2:30 p.m., there were thousands of people already on the west lawn and extending up to the building. It was a sea of people. (Parsons video and Sumrall testimony with video D002). No police made any announcements or went to the street area to tell people not to proceed further. The public address system went unused all afternoon.

The government's non-credible witness, Jason Parsons, said he walked past bicycle racks that he now considers were barriers to keep out. Those racks by the street had no markings at all and were aligned as if they were pedestrian control to manage entry onto the sidewalk and entry path. The government intends for this Court to convict Mr. Mares based on what Mr. Parsons said for his sweetheart cooperation plea deal, and what Mr. Parsons perceived as he live streamed and was connected to unknown people on social media. All video and pictures instead showed that Mr. Mares was detached from what Mr. Parsons was doing and saying, while Mr. Mares tried to get a

signal on his phone and contact his wife. Mr. Mares is rarely within five feet of Mr. Parsons and is almost always detached from the present while looking at his phone. D615-D619; D707 as examples. The entirety of government exhibits in series 500 were meant to try to convict Mr. Mares based on what Mr. Parsons was saying and doing.

Despite the government unfairly and unjustly questioning his integrity, Mr. Mares made clear that he did not wear his distance vision glasses because they kept fogging up. Instead, he wore his anti-fog welding safety glasses. He cannot have perceived the same things that Mr. Parsons saw in the distance. He did not see any indications of gas use. He did not see anything around the tunnel. The government thought it odd that Mr. Mares would travel to see President Trump and not wear his distance vision glasses. Mr. Mares found it odd that he had to be so far away and was unable to get through the line to enter the clearly marked USSS restricted area. He was ready to go through the checkpoint. He did not anticipate being so far away from the stage at the Save America rally at the Ellipse.

In contrast, Mr. Parsons, yelled, cursed police, shouted for people to go in the building, cheered on fighting that he saw vicinity the "tunnel," and glorified his own actions on social media. Neither Mr. Preacher nor Mr. Mares did any of these things. The government ran a trial to convict Mr. Parsons who was never even charged with the Section 1752 counts that were levied against Mr. Mares. The Court cannot infer and speculate that Mr. Mares perceived what Mr. Parsons disingenuously said after the fact were barriers as part of his cooperation plea deal. The evidence was strong against the uncharged Mr. Parsons – while it was non-existent for any intentional or knowing wrongdoing by Mr. Mares. Mr. Preacher, whose testimony was largely credible, made clear that nothing indicated he should not cross the street and go up the west side of the Capitol approach. He testified that he did not even sense anything was wrong until he crossed the

landscaping wall near the plaza. In that regard, it was apparent that he could not contradict his own cooperation plea deal where he admitted to guilt for carrying a weapon.

The evidence was determinative: Mr. Mares saw no remnants of signs or any notice to stay out. The government presented only pictures of signs never visible or present for Mr. Mares' observations. Its exhibits 007-010 were irrelevant and had no context in relation to Mr. Mares. The exhibit signs also demonstrated nothing regarding anything but a colloquially closed area – with no evidence of USSS input or coordination outside of speculation.

In fact, both Mr. Parsons' and other trial video showed Metropolitan Police (MPD) having closed off-side streets along the march route, and channeling people along the march route to the Capitol building, as they had planned. D126. The bicycle racks at the street area by the monument had no "area closed" signs affixed. They were bare of notice. (Sumrall testimony and D002). The lawn signs were torn down over an hour before Mr. Mares arrived. D002. There was no police cordon on the lower terrace or at the street. The police had all retreated inside the building after gassing themselves. D002. Mr. Mares was never subjected to pepper spray or gas. He was not shot at with less lethal force. There was no use of the public address loudspeaker system to tell anyone to leave. The evidence, or lack thereof, showed without any doubt that Mr. Mares had no notice or knowledge of even a colloquially closed area.

Mr. Mares was credible in stating that he climbed over the low wall near the photojournalist tower/plaza as a shortcut. The paths to the right and left of him from the lawn were open. They were packed with people moving forward. The atmosphere at that time, where Mr. Mares was located, was not hostile or violent. The barrage against protestors had ended because the police used up all their ammunition. D002 and Sumrall testimony. Mr. Mares was also credible in stating he did not even know there was such a thing as "US Capitol grounds." He is a rural country resident

of Texas. His state Capitol is a building – period. He truly believed he was walking on open grounds for protestors, like a park. He had never been to D.C. He considered all of D.C. to equal "the capitol," as if a state equivalent "capitol." His understanding was that the "Capitol building" was just that – a building. The Court cannot require him to have possessed the same knowledge as that of D.C. residents and regular visitors.

Mr. Mares cannot be convicted of violating Section 1752 because of the Circuit's accepted standard where *"The Senate Committee's expressed satisfaction with the requisite actual knowledge as to the boundary of the restricted area makes clear that prosecution under section 1752(a)(1)(ii) is inappropriate if an individual does not know that the area is "posted, cordoned off, or otherwise restricted." Griffin* at 40. The court included this statement to counter a requirement that the defendant must know the specific USSS protectee. It makes clear that innocent conduct is not to be prosecuted. Because his conduct was innocent and lacked knowledge of a restricted area (should the west side have been anything but colloquially closed), Mr. Mares must be acquitted.

**5. The government provided no evidence that the Defendant knew anything at all about Mr. Pence's or any USSS protectee's location at the Capitol building**.

The Indictment required the government to show this knowledge. It did not. Because the government did not reissue a superseding indictment prior to trial eliminating this specific knowledge requirement, the Court can take the *Griffin* holding and acquit on the Section 1752 counts. In one sense, ignoring the Indictment and using the Griffin holding can mean that Mr. Mares was charged with a non-crime, where jurisprudence requires acquittal. In another sense, the Court must require conviction based on proof of the specifics in the Indictment. In that regard, the Court must acquit here.

Mr. Mares was credible in stating that he had no idea that anything was happening at the building besides the continuation of the rally. Whether President Trump was to attend or not, the crowd chatter made clear the rally was moving to the Capitol building. The question was raised about Mr. Mares thinking he was marching to an empty building, as of this would be odd. As stated in court, people march to empty state capitol buildings, to the empty US Supreme Court building, and the U.S. Capitol building all the time on weekends when there is no government business. The backdrop is symbolic in an of itself. There is nothing incredible in that an out of state resident believed that only a rally continuation would be happening at a building that he knew nothing else about.

In his speech, Mr. Trump never said that Mr. Pence was at the Capitol. Witness Preacher said he knew what was going on in the building because he had seen explanations about the Electoral Count on Fox News prior to travel. He did not discuss that with Mr. Mares. There were no political discussions during travel, where each said they listened to the radio (or as non-drivers, slept). Mr. Parsons said he had no idea about the VP's location. He heard mention of Pence's name and testified that at the time he did not understand the significance. The government used the fact that Mr. Mares was at the Ellipse and Parson's phone recordings when he was not next to Mr. Mares to infer that Mr. Mares must have heard mention of Mr. Pence. Mr. Mares was credible that due to crowd and flag/wind noise where he was standing, he did not hear mention of Pence – and that other parts of the speeches were indiscernible. Mr. Sumrall confirmed the inability to hear from the areas far from the stage and the temporary speakers. The evidence of multitudes of people departing prior to the end of President Trump's speech to head to the Capitol (or depart the area completely) corroborates the inability of people to hear from the distance and a desire to be closer

to the front at the next stage of rally-going. Mr. Mares stayed until the end of the speech despite the poor sound where he was located.

There is no text, post, or any other insinuation in any evidence that Mr. Mares was aware of VP Pence's location – or that he had notice of a Section 1752 restricted area. Mr. Mares, in a display of attention deficit disorder, was detached from the present and mostly trying to use his phone, whether for business or to contact his wife. Trial video and photos confirmed this. It is only unfounded speculation that he can have heard or known anything about Mr. Pence – or that he cared. He did not know about the Electoral Vote count. The government downloaded every call log, text, picture, and URL search from Mr. Mares' two cell phones and not a shred of evidence indicated that he knew about the Electoral Vote Count, Mr. Pence, anything inside the building, or any restriction outside the building. All the government showed was that Mr. Mares made angry posts in late December 2020 after Nancy Pelosi advertised that Mr. Trump should be dragged out of the White House by his hair. These posts were before Mr. Mares cooled off and later decided (on or about January 3, 2021) to travel to D.C. for the rally. He and Mr. Preacher both wanted to attend a Trump rally – thinking it would be the last opportunity.

The government showed no evidence of criminal intent to commit an illegal act by Mr. Mares. It tried to create intent from pre-rally posts that had run their course. After January 6th, both Mr. Parsons and Mr. Mares exchanged comments about being (f***'d), meaning censored and shut down (in context per testimony).

Mr. Mares must be acquitted because no evidence showed beyond a reasonable doubt (or more than speculation) that he had any criminal intent, knowledge of a restricted area, or knowledge of any USSS protectee at or near the U.S. Capitol building.

**B.  Mr. Mares Must be Acquitted - The Government Did Not Prove Each and Every Element of *18 U.S.C. § 1752(b)(1)* as Charged in Counts One and Two.**

To convict, the government must have proved beyond a reasonable doubt that:

1.  The Defendant knowingly used or carried a deadly or dangerous weapon in the Section 1752 restricted building or grounds.

2.  The Defendant used the deadly or dangerous weapon during and in relation to knowingly and unlawfully entering a building or grounds restricted for protection of a USSS protectee.

Mr. Mares should be acquitted because there was no proof beyond a reasonable doubt that the U.S. Capitol grounds were restricted for a USSS protectee. As stated above, the government used speculation, imprecise government witness testimony language based on speculation that was tailored to convict, and inferences to claim that anywhere on the west side of the U.S. Capitol building was ever anything more than colloquially closed. The government did not prove that Mr. Mares knew he had ever entered any closed area.

The government did not prove beyond a reasonable doubt that Mr. Mares carried a concealed handgun as alleged. Both government witnesses – Parsons and Preacher – testified that they only assumed Mr. Mares was carrying a handgun because he carried it on his right hip on the morning of January 6th at the hotel. The government elicited many times from each witness and they confirmed during cross exam that they never saw him remove his hip holster and handgun. Both witnesses testified that they never saw the handgun on his person outside the hotel on January 6th.

Both Mr. Parsons and Preacher admitted that Mr. Mares went to get the truck while they waited in front of the lobby exit. They admitted he could have removed it while out of their presence and all their assumptions were based on his never having taken the handgun off in theor presence. Mr. Mares was credible in the detail of removing the handgun, placing it in his truck's

storage holster that he did not use to carry a handgun on his person, and placing it locked under the truck's driver side rear seat in his black gym bag.

While both Mr. Preacher and Mr. Parsons were clear that Mr. Mares carried in a right hip holster, they were also clear that they never saw the handgun on his right hip in D.C. They "assumed" it was there. Notable and dispositively, D706-707, taken from Parson's and Preacher's phone evidence from the government, clearly shows there was no handgun on Mr. Mares' right hip. The courtroom demonstration showed that had Mr. Mares been wearing his right hip holster and handgun, it would have been visible forward of his medical aid pouch.

See figure below – D707 as shown in court concurrent with the live demonstration.



**D707 (G529)**

Upon arrival back at the hotel on January 6, 2021, Mr. Parsons took a luggage cart up to the room he shared with Mr. Mares. In this action, he took Mr. Mares black gym bag from under the locked rear seat and placed it on the luggage cart and took it to the room. Mr. Mares parked the truck, and then walked to the lobby entrance where Mr. Preacher was talking to someone. He and Mr. Preacher took the elevator up to the room and entered together. Mr. Mares placed his hat on his bed. He then went into the bathroom for approximately 15 minutes.

Mr. Preacher testified clearly that he only saw Parsons unholster his handgun and place it on Parsons' bed upon return to the hotel room. Mr. Preacher took his handgun off and laid it down. He confirmed that he never saw Mr. Mares remove a holster and handgun from his body or anywhere when they arrived back at the hotel on January 6.[th] Mr. Preacher's testimony showed that Mr. Parsons lied when he said all three men agreed to remove their handguns and place them on the bed for a picture. And that Parsons lied when he said thy all agreed to post a picture on Facebook.

Mr. Preacher credibly testified that he was facing away from Parsons and was talking on his phone. He said Mr. Mares was not present in the main bedroom. Mr. Preacher credibly said he was never aware of Parsons arranging the handguns and rifles on the bed – or taking a picture - until he immediately received a call or text from Parsons' girlfriend about a picture just posted. When Mr. Mares exited the bathroom, having never removed a handgun from his person, Mr. Preacher was chastising Parsons for posting a picture. Mr. Parsons had already replaced Mr. Mares' handgun in the black gym bag and returned that and his hat to Mr. Mares' bed. Mr. Mares noted that something was off. At the time, he just said they needed to order dinner delivery. He was never shown the picture and was never texted the picture. The first he knew of the picture was after arrest. It was not on his phone or in anything of his as searched by the FBI.

The above is clear and convincing evidence – beyond a reasonable doubt – that Mr. Mares did not carry or use a firearm while in D.C. or on U.S. Capitol grounds. He removed his handgun, and it was in the storage holster in his black gym bag locked in the truck. He did not remove a handgun from his person in the hotel room upon retirn because he was not wearing one. He was in the bathroom where he had gone directly prior to Parsons pulling his shenanigans weapons picture stunt. G591. Mr. Parsons even laid out the storage ("Uncle Mikes") holster on the bed that Mr. Mares had stored the handgun in after removing it from his person before traveling to D.C.  Mr. Parsons did not lay out the actual right hip holster because the gun was in the unwearable storage holster. The events prove that Mr. Mares was not wearing the handgun in D.C. and he was truthful. He could not have been wearing it and then placed it in the black gym bag after return to the hotel parking lot because Parsons took that gym bag out of the truck. The handgun was in the bag all day – and was taken to the hotel room by Parsons. Mr. Preacher confirmed that Mr. Mares never removed a handgun from his person – yet it showed up in the picture taken by Parsons while Mr. Mares was in the bathroom. Mr. Parsons lied – he took the handgun out of the gym bag for the staged picture that only he knew about until he posted it.

Mr. Mares had not spoken to Mr. Preacher and their version of events independently corroborated the other's recollection. Even after the government more than unjustly insinuated that Mr. Mares concocted his story, it is beyond a reasonable doubt that Mr. Mares' handgun was not on his person in D.C. and that it was locked in his black gym bag in the truck. The events upon return to the hotel provide all the proof of his innocence. This was furthered by both Mr. Parsons' and Mr. Preacher's testimony that because they never saw Mr. Mares take the handgun off in the morning, they just assumed he had it on.

Regarding firearm wear: Mr. Parsons (and Preacher) assumed that the folds of the camo shirt were an outline, although when shown multiple pictures of the right hip (and even stomach) body area from different angles during trial Mr. Parsons could not identify any handgun outline. D615-619; D707. The government instead pointed to Mr. Mares' stomach and shirt folds. Even though Mr. Mares never wore a stomach-carry holster, and all testified that he open-carried in a right hip holster, the government tried to force belief that Mr. Mares used a stomach carry by requiring during the live demonstration that Mr. Mares completely shift the holster position to different pant belt loops to appear under the camouflage pattern that fit their narrative. At best this was questionable and did not go beyond a reasonable doubt, for this preposterous stomach-carry position. Neither witness ever said they saw or believed Mr. Mares did anything besides use a right hip holster carry. That was corroborated by the alleged CCTV picture from the hotel on the morning of January 6, 2021.

Mr. Mares was credible in testifying that not only would stomach wear as the government insinuated have physically cut him, based on the gun handle and holster abrasion, but it would also not have been possible to bend over or drive. Neither Mr. Preacher nor Mr. Parsons testified as to seeing what would have been a required removal of the handgun in order to drive (or bend over). Quite the opposite, they testified as elicited multiple times by the government that they never saw Mr. Mares remove the handgun and holster from his right hip. Overall, they never saw the handgun outside of Parsons' bed display picture where he alone took the rifles and handguns and staged a picture with nobody else's consent.

A Brady concern is that the government did not produce its investigators, who somehow despite months of trial date notice, both managed to coincidentally be "overseas" for trial. Agent Fuggit was alleged to be the one who reviewed the Comfort Inn hotel video.  The hotel witness

said he was unaware of a warrant or what the government took, **but that there was CCTV of the lobby**. **Incredibly, none of the hotel lobby video was provided by the government** – which would have shown in clear light that **Mr. Mares was NOT wearing a hip holster on the evening of January 6, 2021, when he returned to the hotel**.

The hotel witness lacked credibility as to who he saw and when. He admitted numerous rally goers stayed at the hotel and others wore arms. He said three men arrived back in tactical vests and smelling of pepper gas – in a black truck – when under the front lobby lights, a greenish-blue truck would have been distinguishable. He originally said weeks after January 6th that the time was 7:30 – 8-30 pm. when Mr. Mares and parties arrived before 6:30 p.m. At trial he changed his story after government preparation and outdoor CCTV review to say it was after 6 pm. He could not distinguish "who" because he said many people who attended J6 stayed at the hotel. There were other small groups. The lack of lobby CCTV and out of country FBI investigators allowed the non-credible speculation to be introduced by the government.

**Mr. Mares should be acquitted of the *18 U.S.C. § 1752(b)(1)* charge because he showed innocence, and the government did not prove beyond a reasonable doubt that he was guilty of carrying a concealed handgun. Its case was built on false speculation by two men who did violate the law, although they were never charged with this crime. Further, the government never addressed any "use in relation to Section 1752 as the predicate crime." The "use in relation" to "is baked into" the law and the government mentioned nothing about this.**

**C.  The Government Did Not Prove Any Element of Count 2, 18 U.S.C. § 1752(a)(2) Disorderly or Disruptive Conduct in a Restricted Building or Grounds Beyond a Reasonable Doubt**

*Elements*

*In order to find the defendant guilty of this offense, the factfinder must find that the*

*government proved each of the following elements beyond a reasonable doubt:*

1.  The defendant engaged in disorderly or disruptive conduct in, or in proximity to, any restricted building or grounds so designated for protection of a USSS protectee.

2.  The defendant did so knowingly, and with the intent to impede or disrupt the orderly conduct of Government business or official functions.

3.  The defendant's conduct occurred when, or so that, his specific conduct in fact impeded or disrupted the orderly conduct of specific Government business or official functions.

4.  The defendant knew he was on or close to restricted grounds because he knew of the presence of the Vice President.

All of the argument for **A. Count One, is incorporated here**. The government never showed the west side grounds were restricted, or that Mr. Mares knew there were any restricted grounds. The government never showed he knew anything about the Electoral Count or any government business at the U.S. Capitol. It showed no intent by him to disrupt anything, where no conduct by Mr. Mares can or did disrupt anyone or anything. He did not engage with police. He did not get near the tunnel (remaining over 100 feet away from events he could not see). He did not shout, yell, interfere, obstruct, or impede anyone. The was never told to leave but did so on his own when he did not like the change in tone of the crowd. The Congress had been evacuated before he stepped foot on the grounds. The police had evacuated all other officer workers in the capitol and nearby government buildings. Mr. Mares was not pepper sprayed or told to leave. The public address system was never used to tell him or anyone to leave. When Mr. Mares heard Mr. Parsons' hostile words to police above, Mr. Mares worked his way through the crowd up the stair edge to tell Mr. Parsons they needed to leave. Whether he was up the stairs for 10 or 20 minutes is not relevant, especially given the crowd he had to maneuver through. He committed no disruptive act. The

government unjustly insinuated that Mr. Parsons' conduct and words should be transferred to Mr. Mares. Because he committed no disruptive act and left the grounds that he never knew were closed for any reason without incident, he cannot be convicted.

Because all the government had to offer for evidence – with it being unfairly prejudicial and irrelevant – was video of Mr. Parsons' words and conduct, the Court cannot convict Mr. Mares for what Mr. Parsons was never even charged with. The government did not prove a single element of this crime regarding Mr. Mares.

**D. The Government Did Not Prove Each and Every Element of Count 3 Beyond a Reasonable Doubt**

*Elements*

In order to find the defendant guilty of this offense, the factfinder must find that the government proved each of the following elements beyond a reasonable doubt:

1. The Defendant was knowingly on U.S. Capitol grounds

2. The Defendant knowingly carried or had readily accessible a firearm

**All of the argument, with the exception of the Section 1752 specific items from A, B. and C. above, is incorporated here. Mr. Mares Must be Acquitted – he showed innocence which was not required. He did not and cannot have carried a handgun in D.C. that was locked elsewhere.** The government relied on speculation that because neither Mr. Parsons nor Mr. Preacher saw Mr. Mares remove his right hip holster and handgun on the morning of January 6, 2021, that he must have been carrying it concealed. The attempted use of the camo shirt pattern by requiring during the live demonstration the placement of a holster where Mr. Mares would not have been able to drive, sit, or bend over was an unreasonable attempt to make the camo shirt pattern look like a handgun could be concealed. **The testimony and exhibits showed that Mr.**

**Mares was innocent – and the government did not prove beyond a reasonable doubt that Mr. Mares carried a firearm. No reasonable factfinder could find guilt given the evidence presented at trial – which showed speculation and inference, and then innocence. Mr. Mares must be acquitted.**

## E. The Government Did Not Prove Each and Every Element of Count 4 Beyond a Reasonable Doubt

*Elements*

1. The Defendant willfully and knowingly uttered loud or abusive language, or willfully and knowingly engaged in disorderly or disruptive conduct in any of the United States Capitol Buildings or Grounds.

2. The Defendant willfully and knowingly did so with the intent to impede, disrupt, or disturb the orderly conduct of a session of Congress or either House of Congress, or the orderly conduct of a hearing before, or any deliberation of, a committee of Congress, or House of Congress.

The argument from Count 2 above is incorporated here. All evidence showed Mr. Mares was quiet. He never crossed a police line or attempted to do so. He never came close to a police line. The police made no announcements for anyone to not enter or to leave - as required by regulations when they were using tear gas and shooting into the crowd - when Mr. Mares was off the grounds. Evidence showed Mr. Mares was quiet and passive as he walked around and was jammed in among the crowd. While Mr. Parsons was cursing, yelling, and using his camera (on telephoto) to look into the west tunnel to see violence, the government did not show that Mr. Mares ever saw that, even if seeing something made him individually disruptive without any specific conduct. Congress had suspended proceedings and was evacuated before

he stepped on the lawn. The VP was evacuated before Mr. Mares ever stepped on the lawn. Mr. Mares voluntarily and without incident departed the area an hour before the police began clearing the west outdoors shortly after 5 p.m. The government's CAST report showed that in walking with Mr. Parsons, Mr. Mares was southwest of the Washington Monument when the police were clearing the outside grounds after 5:00 p.m.

The government never even said what government business was allegedly disrupted.

The government showed no evidence of any intent by Mr. Mares to disrupt or interfere with anything at the U.S. Capitol. They never showed he knew anything about a joint session or any ongoing business. He never attempted to go inside the building. Mr. Mares cannot be guilty because of mere, quiet presence alone where he never even saw violence or police engagements. Because of this, he must be acquitted.

## III.    CONCLUSION.

Wherefore, this Court should issue an order acquitting Mr. Mares of all charges. No evidence was presented for any count that showed proof beyond a reasonable doubt for every element. Further, Mr. Mares' instead showed his innocence of the weapon charges in Counts One through Three.

Dated October 29, 2024                    Respectfully submitted,

                                          /s/ *Carolyn A. Stewart*
                                          Carolyn A. Stewart, D.D.C. Bar No. FL-0098
                                          Defense Attorney
                                          Stewart Country Law PA
                                          1204 Swilley Rd.
                                          Plant City, FL 33567
                                          Tel: (813) 659-5178
                                          Email: Carolstewart_esq@protonmail.com

### CERTIFICATE OF SERVICE

I hereby certify on the 29th day of October 2024, a copy of the foregoing was served upon

all parties as forwarded through the Electronic Case Filing (ECF) System.

                                          /s/ *Carolyn A. Stewart*
                                          Carolyn A. Stewart, Esq.